829 So.2d 1057 (2002)
Leonce Jennings MILLER, III
v.
LOYOLA UNIVERSITY OF NEW ORLEANS.
No. 2002-CA-0158.
Court of Appeal of Louisiana, Fourth Circuit.
September 30, 2002.
Rehearing Denied November 15, 2002.
*1058 Leonce Jennings Miller, III, Gretna, LA, In Proper Person, Plaintiff/Appellant.
Richard E. McCormack, Irwin, Fritchie, Urquhart & Moore LLC, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE).
Judge TERRI F. LOVE.
Leonce Jennings Miller, III ("Miller") brought this action against Loyola University of New Orleans ("Loyola") alleging that the school of law failed to provide a complete and satisfactory instruction of a course entitled "The Legal Profession." Loyola filed a peremptory exception of no cause of action and Miller was given leave to amend his petition. Loyola filed a second peremptory exception of no cause of action, which the trial court sustained. For the reasons outlined below we affirm the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
Miller is a part-time student in the evening division of Loyola University of New Orleans School of Law. In the fall semester of 2000, he enrolled in a course entitled "The Legal Profession." The purpose of the course was to teach professional and ethical issues related to the legal profession.
Professor Cynthia Lepow, a tenured professor, was selected to instruct this course. Professor Lepow's specialty is tax law, and this was the first time that she had been called upon to instruct this course.
Miller alleges several deficiencies in Professor Lepow's instruction. Miller complains that Professor Lepow did not timely order materials for class, that she changed the course time without permission from the law school, Professor Lepow had the students perform class presentations on subjects she was obligated to teach, Professor Lepow only covered approximately 60% of the Model Rules of Professional Conduct with her lectures and all of the student presentations combined, and finally, Professor Lepow gave a final examination consisting of materials from the National Conference of Bar Examiners and her original questions, which contained serious errors.
Miller was not present when the course evaluations were distributed, so he went to the Dean's office and requested he be allowed to complete a student evaluation. After Miller lodged his various complaints, he met with the Associate Dean of the Law School, Rev. Lawrence Moore, S.J., and requested a refund of the cost of the course, that the course be removed form his transcript, and that he be allowed to re-take the class with another professor. Rev. Moore advised Miller to submit a written complaint to the Loyola Law School Faculty Petitions Committee.
The Faculty petitions Committee renounced jurisdiction of this matter, and James Klebba, the Dean of the Law School, convened a special ad hoc committee to review this case, which consisted of former Deans and Associate Deans of the law school. The committee found: 1) that Professor Lepow violated the faculty handbook by making an arbitrary and unauthorized change in the time that the course was scheduled; 2) that Professor Lepow failed to timely request books for the course; 3) that Professor Lepow gave a final examination that contained errors and copied questions from the National Conference of Bar Examiners materials; 4) that the overall effectiveness of the professor was below satisfactory; 5) that the professor's responses to questions asked were below satisfactory; 6) that the professor excused one student from half of the regularly scheduled classes and this presented a problem with the Socratic method *1059 of teaching; and 7) that the professor had difficulty in communicating the course material to the students. The Dean adopted all of the committee recommendations and Professor Lepow was sanctioned with the procedures set out on the faculty handbook.
Miller filed this action to recover the cost of the course and other damages including reimbursement for taking the course a second time at his own expense. His amended petition asserts the following theories of liability against Loyola: 1) Loyola was negligent for failing to provide a qualified professor to teach the legal profession course; 2) Loyola was negligent for failing to have the requisite number of professors required to teach their course offerings as was outlined in the School of Law course listing for the Fall 2000 semester; 3) Loyola breached "[its] conventional obligation" by accepting payment for the course, then not giving complete instruction in the subjects as stated in the law bulletin; 4) Loyola breached its obligation to provide the course of instruction reasonably expected for a recognized accredited institution of higher education; 5) Loyola was monetarily unjustly enriched; 6) Loyola breached its obligation to provide the course at the time it was listed in the course schedule; 7) Loyola breached its obligation to supply the course instruction necessary to pass the MPRE examination and to practice in the profession of law; 8) Loyola was negligent for falsely representing the course of instruction, the details of the course of instruction and the time the course was offered; 9) Miller detrimentally relied on Loyola's promise to provide a specific course of instruction as outlined in the catalog, at the time published, and to provide the necessary course of instruction required to practice in the legal profession, which Loyola failed to keep; Loyola knew plaintiff would rely on its promises; and, Miller is irreparably harmed by Loyola's refusal to remove the course from his official transcript and Miller's lost time and effort toward the pursuit for his Juris Doctor degree, including additional time required to retake the course and the delay in graduation and his ability to practice law.
Loyola asserts that Miller, along with the other students of Professor Lepow's class, were given the opportunity to audit the course the following semester at no charge. However, Miller refused this opportunity, enrolling in the course in the fall semester of 2001 at his own expense.

DISCUSSION
Dismissal of a claim is justified only when the allegations of the petition itself clearly show that the plaintiff does not state a cause of action. Farmer v. Marriott Int'l, Inc., XXXX-XXXX, p. 2 (La. App. 4th Cir. 12/27/01), 806 So.2d 89, 91. A court appropriately maintains the peremptory exception of no cause of action only when, conceding the correctness of the well-pleaded facts, the plaintiff has not stated a claim for which he can receive legal remedy under the applicable substantive law. Id. at p. 3, 806 So.2d at 91. In reviewing a trial court's ruling on the exception, the appellate court should conduct a de novo review.
In Miller's first assignment of error, he asserts that the trial court incorrectly held that he failed to state a cause of action against Loyola for various breaches of contract for specific promises it made regarding the content to a college course offered, the time the course was offered and the quality of the educational instruction the school promised. In his second assignment of error, Miller asserts that the trial court incorrectly held that he failed to state a cause of action against Loyola for various acts of negligence committed by the school and one of its professors. We will address these assignments of error together.
*1060 The great weight of authority generally holds that the law recognizes no cause of action for "educational malpractice", either in tort or contract, by a student against a private educational institution asserting inadequate or improper instruction. Bittle v. Oklahoma City University, 6 P.3d 509, 514 (Ct.App. Div. 3 4/21/00). The courts uniformly reason that such a claim runs afoul of established public policy with both accords educational institutions broad discretion in matters purely academic ... and directs judicial non-interference in the decisions with that discretion. Id. ... [W]e are persuaded by the overwhelming weight of authority from other jurisdictions that, absent a specific, identifiable agreement for the provision of particular services, the public policy ... militates against recognition of a claim by a student against a private educational institution arising from the institution's alleged improper or inadequate instruction however denominated either in tort or contractfor "educational malpractice." Bittle, 6 P.3d at 515.
In Ross v. Creighton University, 957 F.2d 410 (7th Cir.1992), the Court of Appeals discussed the issue as follows:
Courts have identified several policy concerns that counsel against allowing claims for educational malpractice. First, there is a lack of a satisfactory standard of care by which to evaluate an educator. Theories of education are not uniform, and "different but acceptable scientific methods of academic training [make] it unfeasible to formulate a standard by which to judge the conduct of those delivering the services." Second, inherent uncertainties exist in this type of case about the cause and nature if damages. "Factors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential and immeasurable role in learning." Consequently, it may be a "practical impossibility [to] prov[e] that the alleged malpractice of the teacher proximately caused the learning deficiency of the plaintiff student." A third reason for denying this cause of action is the potential it presents for a flood of litigation against schools .... "education is a service rendered on an immensely greater scale than other professional services." The sheer number of claims that could arise if this cause of action were allowed might overburden schools. The final reason courts have cited for denying this cause of action is that it threatens to embroil the courts into overseeing the day-to-day operations of school. This oversight might be particularly troubling in the university setting where it necessarily implicated considerations of academic freedom and autonomy. To state a claim for breach of contract, the plaintiff must do more than simply allege that the education was not good enough. Instead he must point to an identifiable contractual promise that the defendant failed to honor.... [I]f the defendant took tuition money and then provided no education, or alternatively, promised a set number of hours of instruction and then failed to deliver, a breach of contract action may be available. In these, cases, the essence of the plaintiffs complaint would not be that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all. Ruling on this issue would not require an inquiry in to the nuances of educational processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise.
(Internal citations omitted)

Ross, 957 F.2d at 414-15, 416-17.
The New Jersey Superior Court stated in Swidryk v. St. Michael's Medical Ctr., *1061 201 N.J.Super. 601, 605, 493 A.2d 641, 643 (1985):
To entertain a cause of action for "educational malpractice" would require the courts not merely to make judgments as to the validity of broad educational policiesa course we have unfalteringly eschewed in the pastbut, more importantly to sit in review of the day-to-day implementations of those policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the ... school system...
(Internal citations omitted)
Louisiana law does not recognize a cause of action for educational malpractice under contract or tort law. Miller cites to many contract provisions in the Civil Code, none of which apply to a situation such as this one, where a student complains that the content and quality of instruction in a particular class was insufficient, and that an instructor improperly changed the time of the course. While there are instances where a contractual breach has been found between a university and a student,[1] it has been based on the university's failure to provide a guaranteed service. This is not the case here. The same conclusions may be drawn about tort claims of educational malpractice. Miller asserts that Loyola was negligent in not having enough professors available to teach courses, thus resulting in the negligent quality of instruction. However there is no legal basis to allow such a claim. This Court looked to other jurisdictions and found that there is a persuasive public policy argument against findings a cause of action for educational malpractice that is endorsed by most states. We are inclined to follow these other jurisdictions and do not recognize a claim for educational malpractice either in contract or tort. Universities must be allowed the flexibility to manage themselves and correct their own mistakes. In the instant case, Loyola did have procedure in place to deal with a situation as the one before use. It is not the place of the court system to micro-manage the adequacy of instruction or management at institutions of higher learning, even if it were feasible, which we feel it is not. This is a task best handled by the universities themselves.
Since the law does not provide for a cause of action under contract or tort for Miller's various claims, we find that Miller does not state a cause of action against Loyola.
In Miller's third assignment of error, he argues that the trial court incorrectly held that he failed to state a cause of action for unjust enrichment, since Loyola accepted tuition from Miller, then failed to deliver the promised content of the course, causing him to retake the course at his own expense.
The Louisiana Supreme Court set forth the following factors to establish unjust enrichment: 1) there must be an enrichment, 2) there must be an impoverishment, 3) there must be a connection between the enrichment and resulting impoverishment, 4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and 5) there must be no other remedy at law available to plaintiff. Baker v. Maclay Properties Co., 648 So.2d 888, 896 (La. 1995). We find Loyola's argument persuasive that Miller did not satisfy the second element of impoverishment. In return for his tuition payment Miller received instruction and credit for attending *1062 the course taught by Professor Lepow. Despite his claims that the course instruction was unsatisfactory, Miller got the value from the course that was guaranteed by his tuition payment. The fact that he felt he need to take the course again, for credit and at his expense, was his own decision, not one imposed upon him by the university. He took the course again of his own volition. Miller's argument that he took the course because Professor Lepow's instruction left him unprepared for the MPRE is unpersuasive. When he paid for the first course, it was for the opportunity to study the subject and receive credit toward his Juris Doctor. Since Miller does not claim he was denied credit, we must assume that he received the full value of tuition payment for the class. That Miller enrolled in the class again for credit was his own decision and therefore, he states no cause of action for unjust enrichment.
In his final assignment of error, Miller asserts that the trial court incorrectly held that he failed to state a cause of action against Loyola for his detrimental reliance on the Loyola's promises, made in the course description for "The Legal Profession."
La. C.C. art.1967 defines detrimental reliance as follows:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other part was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
In order for Miller to successfully assert a claim of detrimental reliance he must show that Loyola wrote the course descriptions knowing that he would rely on the statements made and whether or not Miller reasonably relied upon the promises and was damaged by his reliance. We find that Miller's reliance on the course description was unreasonable. Course descriptions are given to inform the student of what is generally covered in the course; they are not contractual provisions that bind the school to teach exactly what is written in the description. There are many reasons why a particular course might not live up to its description. For instance, perhaps the students need extra instruction on a particular subject, which precludes every topic from being covered in a given semester. Current events may dictate that the course structure be changed to address more pertinent topics. Perhaps a teacher does not manage the course time optimally, and some subjects are not taught. Education must be flexible to accommodate changing circumstances; therefore the course bulletin cannot be looked upon as contractual provision that gives students opportunity to sue the school if they feel that their expectations are not met or if the course does not fit the description exactly.
Not only do we find Miller's reliance on the course description unreasonable but also Louisiana law does not recognize that course descriptions are binding contract. Despite Miller's attempt to apply traditional contract law to the instant claim, there is no law either by the legislature or jurisprudence that supports his argument. A claim of detrimental reliance cannot be based on a contractual claim that is not provided for by law.

CONCLUSION
For the foregoing reasons, we find that Miller has no cause of action against Loyola for educational malpractice in contract or in tort. Further we find that Loyola was not unjustly enriched by Miller's decision to retake the course at his own expense, *1063 and that Miller has not stated an actionable claim of detrimental reliance. The trial court properly dismissed Miller's claims.

AFFIRMED.
PLOTKIN, J., dissents with reasons.
PLOTKIN, J., Dissents with Reasons.
I must respectfully dissent from the majority's conclusion that Louisiana law does not recognize a cause of action for educational malpractice under contract or tort law. The majority does not cite any prior case law in order to support this notion. Because I have concluded that in some narrow and specific instances a cause of action for educational malpractice should be recognized, I must dissent.
The Appellant's cause of action represents a case of first impression in this jurisdiction. The majority of courts have rejected a claim of educational malpractice on the basis of public policy concerns outlined within the majority opinion. Only Montana allows these claims to go forward, and its decision was based on state statutes that place a duty of care on educators, a circumstance not present here. B.M. v. State, 200 Mont. 58, 649 P.2d 425, 427-28 (1982). Courts in at least eleven states have considered and rejected claims for educational malpractice: Alabama, Alaska, California, Florida, Idaho, Iowa, Kentucky, Maryland, New Jersey, New York, and Wisconsin. See, e.g., Blane v. Alabama Commercial College, Inc., 585 So.2d 866 (Ala.1991); D.S.W. v. Fairbanks North Star Borough School Dist., 628 P.2d 554 (Alaska 1981); Peter W. v. San Francisco Unified School Dist., 60 Cal. App.3d 814, 131 Cal.Rptr. 854 (1976); Smith v. Alameda County Social Servs. Agency, 90 Cal.App.3d 929, 153 Cal.Rptr. 712 (1979); Tubell v. Dade County Public Schools, 419 So.2d 388 (Fla.Dist.Ct.App. 1982); Wickstrom v. North Idaho College, 111 Idaho 450, 725 P.2d 155 (1986); Moore v. Vanderloo, 386 N.W.2d 108 (Iowa 1986); Rich v. Kentucky Country Day, Inc., 793 S.W.2d 832 (Ky.Ct.App.1990); Hunter v. Board of Educ., 292 Md. 481, 439 A.2d 582 (1982); Swidryk v. St. Michael's Medical Center, 201 N.J.Super. 601, 493 A.2d 641 (Law Div.1985); Donohue v. Copiague Union Free School Dist., 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979); Hoffman v. Board of Educ., 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979); Helm v. Professional Children's School, 103 Misc.2d 1053, 431 N.Y.S.2d 246 (App. Term 1980); Wilson v. Continental Ins. Cos., 87 Wis.2d 310, 274 N.W.2d 679 (1979). See also Joel E. Smith, Annotation, Tort Liability of Public Schools and Institutions of Higher Learning for Educational Malpractice, 1 A.L.R.4th 1139 (1980).
The majority opinion quotes liberally and relies heavily upon the logic and reasoning of the Seventh Circuit Court of Appeals decision in Ross v. Creighton University. 957 F.2d 410 (7th Cir.1992). The majority, however, fails to mention that the court in Ross did in fact award the plaintiff a limited cause of action for educational malpractice based on a breach of contract claim and remanded the case for further proceedings. Ross, 957 F.2d at 416. The court in Ross stated,
Accordingly, we must disagree respectfully with our colleague in the district court as to whether the contract counts of the complaint can be dismissed at the pleadings stage. In our view, the allegations of the complaint are sufficient to warrant further proceedings...we believe that the district court can adjudicate Mr. Ross' specific and narrow claim that he was barred from any participation in and benefit from the University's academic program without second-guessing the professional judgment of *1064 the University faculty on academic matters.
Id. at 416.

1. Educational Malpractice: A Mix of Tort and Contract Law Claims.
The educational malpractice cause of action stems from both tort and contract law. There is an important distinction between the two, which the Ross decision illustrates. There are a number of public policy concerns cited in Ross and reiterated in the majority opinion against allowing a educational malpractice cause of action as a general tort law claim. I support the majority opinion's rejection of a general negligence cause of action, which simply attacks the general quality of an education. Judicial oversight as to the reasonableness and quality of education would be an immense effort without ascertainable or clearly definable standards. Much in the same way the business judgment rule exists to keep judges from substituting their judgment for that of the executive or the board member, here too the courts should defer to the expertise of educators and administrators when it comes to negligence claims by students. Therefore, I would bar a claim of educational malpractice under traditional tort law theory because the judiciary should continue to defer to the expertise of the educators regarding the overall quality of an education.
The educational malpractice cause of action is much stronger when it evolves directly from a breach of contract claim. When the cause of action results from a breach of contract by the university, I believe there are certain remedies, which a court can fashion for the wronged student. The breach of contract claim cannot result from a general lack of a quality education. Rather a narrow cause of action can exist which results from the principles of good faith and fair dealing. The traditional remedies employed by the courts can be used to ensure that if the contract existing between students and universities is breached, the plaintiff can be compensated. In this day and age, with the ever increasing price of higher education, universities now aggressively market themselves to would be consumers. Students should have some form of remedy available to them when they are specifically promised something, which is not delivered. With the use of marketing tactics by universities, comes added responsibility and accountability to the consuming public. Therefore, public policy and sentiments of equity and justice require Louisiana law to allow for a limited cause of action for educational malpractice involving breach of contract claims.
Traditionally the courts have been very reluctant to rigidly apply contract law in adjudicating student claims against colleges due to the necessity of allowing schools significant leeway in educating their students. Marquez v. University of Wash., 32 Wash.App. 302, 648 P.2d 94 (1982); Cuesnongle v. Ramos, 713 F.2d 881 (1st Cir.1983). This general reluctance and deference allows for student claims against universities to be largely ignored, resulting in a continued and prolonged lack of oversight and accountability. Students can use contract law's implied obligations of good faith and fair dealing in some cases in order to receive what was promised to them. Inherent within the contract between students and universities are a number of implied promises and an imbalance of bargaining power. Courts cannot and should not attempt to be the forum to litigate all potential implied promises between the educating institution and the student. Courts can, however, use good faith and fair dealing as a framework to protect institutional autonomy, accord substantial deference to educators and administrators, while protecting student rights and providing some accountability *1065 to higher education. As one commentator has noted,
When college personnel make concrete and easily verifiable representations that do not intrude too extensively into the academic realm, courts shed their deferential view. For example, when personnel misrepresent the type and quality of equipment and facilities available in recruiting students, the claim of misrepresentation is potentially viable. When schools misrepresent the accreditation status of the school, the employability of students with a degree, or fail to deliver the educational program promised, the claims may succeed when sufficiently specific.
See Hazel Glenn Beh, Student versus University: The University's Implied Obligation of Good Faith and Fair Dealing, 59 Md. L.Rev. 183, 205-206 (2000). For specific examples of court's using good faith and fair dealing to hear student claims, see also CenCor, Inc. v. Tolman, 868 P.2d 396, 399 (Colo.1994) (en banc) (reversing the trial court ruling in favor of the school and holding that students have a cause of action where they allege that a school represented in their catalog that students would train on "up-to-date equipment and instruments" and work under "qualified faculty"); Dizick v. Umpqua Community College, 287 Or. 303, 599 P.2d 444, 449 (1979) (en banc) (reinstating a damages award to a student where a community college falsely represented the type of equipment that would be available to him in welding classes); Lesure v. State, No. 89-347-11, 1990 WL 64533, at *4-5 (Tenn.Ct.App. May 18, 1990) (finding liability where the university misrepresented that the respiratory therapy school was accredited); American Commercial Colleges, Inc. v. Davis, 821 S.W.2d 450, 452 (Tex.App.1991) (finding a breach where a "catalogue promised such things as qualified teachers, modern equipment, a low teacher to student ratio, and excellent training aids" but that the "college actually provided one unqualified teacher in a room with seating for 42 students, all taking different level courses, with only two 10-key adding machines" and the "only training aid was an unused overhead projector").
A full analysis of the Ross decision further illustrates this point, as the court fashioned a remedy for the plaintiff based upon the contract principles of good faith and fair dealing. 957 F.2d 410 (7th Cir. 1992). In this case, the plaintiff was a basketball player and student who filed suit against Creighton University alleging educational malpractice and breach of contract. Id. at 411. Creighton recruited the plaintiff and awarded him an athletic scholarship although his academic record did not comport with Creighton's normal standards. Id. at 411. He scored in the bottom fifth percentile of college-bound seniors while average freshman admitted to Creighton with him scored in the upper twenty-seven percent. Id. at 411. Ross played for Creighton for four years, during which time he maintained a D average in courses such as Marksmanship and Theory of Basketball. Id. at 412. Upon leaving Creighton after his athletic eligibility ended (and thirty-two credits shy of his graduation requirements), Ross read at a seventh grade level and had the language skills of a fourth grader. Id. at 412. Ross complained that this was in direct violation of what Creighton had promised him. The court stated, "According to the complaint, Creighton realized Mr. Ross' academic limitations when it admitted him, and, to induce him to attend and play basketball, Creighton assured Mr. Ross that he would receive sufficient tutoring so that he `would receive a meaningful education while at Crieghton.'" Id. at 411.
The court in that decision fashioned a narrow remedy for the plaintiff and allowed for a breach of contract claim within *1066 the educational malpractice setting. The court said,
To state a claim for breach of contract, the plaintiff must do more than simply allege that the education was not good enough. Instead, he must point to an identifiable contractual promise that the defendant failed to honor.... the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all. Ruling on this issue would not require an inquiry into the nuances of educational processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise.
Id. at 417. The court used the notions of good faith and fair dealing to allow the plaintiff to have his day in court. The appellate court on remand instructed the trial court that the review should be limited as to whether Ross was barred from any participation in and benefit from the University's academic program without second-guessing the professional judgment of the University faculty on academic matters. By employing the standards of good faith and fair dealing, courts can review the alleged breach of contract while maintaining proper deference to the educating institution.
In the present matter, the record is incomplete, as the defendant has filed a peremptory exception of no cause of action. The plaintiff/appellant has sued claiming breach of contract, unjust enrichment and detrimental reliance. I would remand this case to the trial court in order to give the Appellant an opportunity to further develop the facts supporting his assertion that the Appellee breached the contract existing between the two parties. I would limit the plaintiff's available cause of action to whether or not the Appellee upheld the standards of good faith and fair dealing.
NOTES
[1] In Ross, the court did recognize a very limited cause of action for breach of contract against Creighton University. However the circumstances that led the court to that recognition are not present in the instant case.