# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2124

_____

Ahmed Soueidan

*Plaintiff - Appellant*

v.

St. Louis University

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 17, 2019
Filed: June 14, 2019

_____

Before SMITH, Chief Judge, COLLOTON and ERICKSON, Circuit Judges.

_____

SMITH, Chief Judge.

Ahmed Soueidan appeals from the district court's[1] order dismissing his Missouri state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraudulent misrepresentation against St. Louis

---

[1]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

University (SLU). Soueidan argues that the district court erroneously dismissed the claims under the educational malpractice doctrine and for failure to prove the required elements. He further asserts that the district court erred in denying his request for leave to amend his complaint. We affirm.

I. *Background*[2]

Soueidan enrolled as a doctoral student at SLU in the Parks College of Engineering, Aviation and Technology in 2012. SLU represented to Soueidan that he would obtain his Ph.D. in mechanical and aerospace engineering in four years. In August 2012, Soueidan met with the department chair to discuss a plan of study. The department chair drafted a plan for Soueidan to graduate with his doctoral degree in four years. Soueidan began following the plan and enrolled in coursework.

Soueidan attempted to find a Ph.D. advisor to supervise his graduate studies, but he was unable to find anyone willing and able to accept new graduate students. One professor even told Soueidan that he "should not be in this program." Compl. at 2, ¶ 10, *Soueidan v. St. Louis Univ.*, No. 4:17-cv-02777 (E.D. Mo. Nov. 27, 2017), ECF No. 1. As a result, Soueidan completed his first three semesters without an advisor.

In December 2013, Professor Raymond Lebeau agreed to serve as Soueidan's advisor. Lebeau indicated that he could get Soueidan through the program in two more years, even though Lebeau had no research or funding for Soueidan. Lebeau was uncertain about the requisite qualifying examination for Soueidan. As a result, Soueidan referred to the SLU Graduate Student Handbook ("Handbook") for

---

[2]In reviewing the grant of a motion to dismiss, we recite the facts as alleged in Soueidan's complaint and assume them to be true. *See Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (en banc) (per curiam) ("We assume all facts in the complaint to be true, and [we] draw all reasonable inferences in favor of the non-moving party.").

guidance. But Lebeau advised Soueidan to disregard the Handbook's guidelines. Lebeau told Soueidan that they would "do it our way" and that Soueidan was "a guinea pig for this program." Compl. at 3, ¶ 13.

In August 2014, the graduate coordinator, graduate programs assistant, department chair, and several professors in the department simultaneously left SLU. By August 2015, the graduate programs assistant[3] and the Dean of the College of Engineering left their positions. By that time, Soueidan had completed ten graduate-level courses toward satisfying the course credits requirement for his Ph.D. in accordance with the Handbook.

In June 2015, Lebeau advised Soueidan that he needed to attend a conference to prepare for the qualifying examination. In January 2016, they attended the AIAA SciTech 2016 conference in San Diego, California. At that conference, Soueidan presented his thesis work. Soueidan paid for all of his conference expenses.

In May 2016, Soueidan met with Lebeau and the graduate coordinator to discuss the timing of Soueidan's qualifying examination. Thereafter, Lebeau recommended that Soueidan do a practice exam in preparation for the actual exam. Following Soueidan's practice examination, Lebeau told Soueidan that two of the committee members said Soueidan would not pass his examination. But, Lebeau noted, a third committee member said he would have passed Soueidan. Lebeau relayed this information to Soueidan before the actual exam so "bullets wouldn't go flying." *Id*. at 4, ¶ 16.

---

[3] Soueidan averred that the "graduate programs assistant" left SLU "[i]n August 2014," but he also averred that the "graduate programs assistant" left "[o]ne year later, in 2015." *Id*. at 3, ¶ 14. The complaint does not explain if a new graduate assistant was hired after August 2014 and departed by August 2015.

In August 2016, at the start of his fifth year at SLU, Soueidan took the qualifying examination. One committee member informed Soueidan prior to the examination that Soueidan did not follow the guidelines for writing his paper and questioned his preparedness for the examination. After the examination, Lebeau told Soueidan that he "should not have been let in here" because Lebeau was "not interested in new ideas" and was "afraid of putting Mr. Soueidan out there because Mr. Leabeau didn't know what Mr. Lebeau was doing and didn't want to bear that responsibility." *Id*. at 4, ¶ 17 (brackets omitted).

After not passing the qualifying examination, Soueidan was instructed to take another written examination and perform additional course work. Notably, Soueidan had suggested to Lebeau years prior that he take this same written exam. The exam is normally taken within the first year of Ph.D. studies. Soueidan did enroll in the recommended additional course. He also met an additional time with the graduate coordinator and Lebeau to discuss his progress.

In the fall of 2016, after over four years, Soueidan left the Ph.D. program and downgraded to a Master's degree. But, in a final attempt to obtain his Ph.D., Soueidan spoke with the SLU Provost of Academic Affairs about his situation. The Provost initially advised Soueidan to leave SLU to join a new program and that the Provost would help him get his dissertation credits refunded. Later, after speaking with the Dean of the College of Engineering, the Provost advised Soueidan to find an established research project. Soueidan was unable to find one.

In February 2017, at the Provost's behest, Soueidan renewed his relationship with Lebeau. Lebeau, however, still showed uncertainty advising Soueidan going forward. Lebeau directed Soueidan to the Handbook's guidelines. Lebeau told Soueidan, "We do it the way SLU does it." *Id*. at 5, ¶ 25. Nevertheless, Lebeau remained unfamiliar with the exam format and procedures. At this point, Soueidan decided to earn his Ph.D. by beginning anew at a different university.

Soueidan filed suit against SLU, alleging Missouri state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraudulent misrepresentation. In support of his claims, Soueidan referred to several sections of the Handbook that he claimed SLU failed to follow during his time in the Ph.D. program. According to Soueidan, SLU's failure to "meet their obligation[s]" set forth in the Handbook "made it very unlikely from the beginning that [he] would be able to achieve his Ph.D. degree at SLU." *Id*. at 6, ¶ 30. First, the Handbook provided that "[y]ou should have an advisor assigned within the first few weeks of classes starting." *Id*. at 6, ¶ 27 (quoting Handbook at 9). Soueidan alleged that "SLU did not assign an advisor to [him]" within the first few weeks of the program. *Id.* Instead, Soueidan was without an advisor until December 2013, "a year and a half after [he] began the Ph.D. program." *Id*. at 6, ¶ 28.

Second, the Handbook "indicate[d] that students are to meet with their advisor in January to complete their Annual Student Review." *Id*. at 6, ¶ 29 (citing Handbook at 9). Soueidan alleged that he was deprived of this review, which "would have been an opportunity for Mr. Soueidan to 'have a review of [his] work completed, create goals for the next year of studies and research, *and ensure [he was] staying on track for graduation*.'" *Id*. (bold omitted) (first alteration in original).

Third, the Handbook stated that "'[f]or Engineering students, the Qualifying Exam is scheduled after 2 semesters,' and that '[t]he Qualifying Exam is designed to determine if the student is prepared to continue Ph.D. studies and carry on with research.'" *Id*. at 6, ¶ 31 (second alteration in original) (quoting Handbook at 12). Soueidan alleged that because he was without an advisor after two semesters, the Qualifying Exam was not scheduled and he "missed out on another opportunity to ensure he was on track to obtain a Ph.D." *Id*. at 7, ¶ 31. He noted that he did not take the Qualifying Exam "until August 2016, at the start of his *fifth* year at SLU." *Id*. at 7, ¶ 32 (bold omitted).

In support of his claims, Soueidan additionally cited the 2015–2016 SLU Graduate Education Catalog ("Catalog"). The Catalog "indicate[d] that the Parks College of Engineering does in fact have a Ph.D. program." *Id.* at 7, ¶ 33 (citing Catalog at 111). Soueidan alleged that "in practice, students who register for the SLU College of Engineering Ph.D. program are faced with" an insufficient number of "professors with funding or research to serve as advisors to these Ph.D. Students." *Id.* at 7, ¶ 34. Soueidan alleged that "[a]s a prospective student, [he] had a right to rely upon the Catalog and that is what he did when enrolling in the Ph.D. program at SLU." *Id.* at 7, ¶ 35.

Soueidan alleged that SLU's fraudulent conduct "cost [him] nearly $200,000.00 in tuition payments." *Id.* at 7, ¶ 36.

SLU moved to dismiss Soueidan's complaint, and the district court granted the motion. First, the court determined that Missouri's educational malpractice doctrine applied to all of Soueidan's claims and required dismissal. According to the court, Soueidan's claims would impermissibly require it "to determine whether SLU timely assigned a Ph.D. advisor, conducted a student review, and scheduled the qualifying examination and how those decisions affected Soueidan's matriculation." *Soueidan v. Saint Louis Univ.*, No. 4:17-cv-02777, 2018 WL 1997287, at *3 (E.D. Mo. Apr. 27, 2018). His claims would also require the court "to analyze whether SLU breached its contract by 'failing to award . . . Soueidan the Ph.D. degree he was promised after completing all directives and 5 years of requisite coursework'" and "to address not only the quality of the Ph.D. program but also whether Soueidan comprehensively and adequately completed all of his coursework." *Id.* (ellipsis in original) (quoting Compl. at 8, ¶ 39). The court held that making such determinations would require the court to examine SLU's educational process. Thus, the educational malpractice doctrine barred Soueidan's claims.

Second, the district court alternatively held that Soueidan's claims of breach of contract and breach of the covenant of good faith and fair dealing required dismissal "based upon the timing of this action and of the alleged discrete, contractual promises relied upon by Soueidan." *Id.* at \*4. According to the court, "Soueidan was admitted and accepted into the Ph.D. program in 2012, which is when the alleged contract would have been formed." *Id*. But Soueidan did not receive the alleged promises until "after his 2012 contract with SLU was formed." *Id*. The court noted that Soueidan "first reviewed the Handbook in December 2013." *Id*. Furthermore, Soueidan's claims were also premised on "promises contained in the 2015–2016 Catalog[ ]." *Id*. "Thus," the court concluded, "Soueidan could not have relied upon these promises in the Handbook and Catalog when he e[nr]olled in the Ph.D. program in 2012." *Id*. The court held that Soueidan's breach claims failed because Soueidan failed "to identify any promises that he relied upon when he e[nr]olled in 2012." *Id.*

Third, the court held that Soueidan's fraudulent misrepresentation claim required dismissal because "Soueidan . . . failed to allege a fraud that is independent of his contract action. Rather, his fraud claim is based upon the same promises and actions that he alleged to support his breach of contract claim." *Id*.

Finally, the district court "denie[d] Soueidan's request to file an amended complaint because he . . . failed to provide a proposed amendment along with his request." *Id*. at \*5.

## II. *Discussion*

On appeal, Soueidan argues that the district court erroneously dismissed his Missouri state-law claims for breach of contract, breach of the covenant of good faith and fair dealing, and fraudulent misrepresentation. Specifically, Soueidan contends he provided sufficient evidence of all the required elements in each cause of action and that the court should not have applied Missouri's educational malpractice

doctrine. He further asserts that the district court erred in denying his request for leave to amend his complaint.

## A. *Educational Malpractice Doctrine*

We review de novo a district court's grant of a motion to dismiss. *BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 546 (8th Cir. 2018). To survive a motion to dismiss, the plaintiff must show that he "is entitled to relief, by alleging sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (quoting *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc)).

The district court determined that the educational malpractice doctrine bars all of Soueidan's claims. We agree.

> In educational malpractice cases, a plaintiff sues his or her academic institution for tortiously failing to provide adequate educational services. If a negligence claim raises questions concerning the reasonableness of the educator's conduct in providing educational services, then the claim is one of educational malpractice. Similarly, if the claim requires an analysis of the quality of education received and in making that analysis the fact-finder must consider principles of duty, standards of care, and the reasonableness of the defendant's conduct, then the claim is one of educational malpractice. If the duty alleged to have been breached is the duty to educate effectively, the claim is one of educational malpractice. A claim that educational services provided were inadequate, substandard, or ineffective constitutes a claim of educational malpractice. Where the court is asked to evaluate the course of instruction or the soundness of the method of teaching that has been adopted by an educational institution, the claim is one of educational malpractice.

*Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 700 (Mo. Ct. App. 2008) (cleaned up).

"Generally, courts have refrained from recognizing educational malpractice claims, either in tort or contract, on the premise that '[u]niversities must be allowed the flexibility to manage themselves and correct their own mistakes.'" *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) (alteration in original) (quoting *Miller v. Loyola Univ. of New Orleans*, 829 So.2d 1057, 1061 (La. Ct. App. 2002)). Missouri courts have "refuse[d] to recognize a claim for educational malpractice" because it is not the role of courts "to micromanage a university's daily operations." *Id.* (citing *Dallas Airmotive, Inc.*, 277 S.W.3d at 700 ("[C]ourts have refused to become the overseers of both the day-to-day operation of [the] educational process as well as the formulation of its governing policies" (second alteration in original) (internal quotations omitted))).

In the present case, Soueidan relies on the Catalog and Handbook in support of his contract and fraudulent misrepresentation claims. But all of the statements provided in these sources are "aspirational in nature." *Id.* at 6. First, the Handbook's statement that "[y]ou *should* have an advisor assigned within the first few weeks of classes starting," Compl. at 6, ¶ 27 (quoting Handbook at 9) (emphasis added), does not create an obligation on the part of SLU to assign Soueidan an advisor. Not only does the Handbook fail to specify *who* assigns the advisor, but it also uses the term "should," not "must" or "shall." *Cf. Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) ("The Developmentally Disabled Assistance and Bill of Rights Act, a 1975 measure, *stated in aspirational terms* that '[t]he treatment, services, and habilitation for a person with developmental disabilities . . . *should* be provided in the setting that is least restrictive of the person's personal liberty.'" (first emphasis added) (alterations in original) (citation omitted)); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'"); *Union Elec. Co. v. Consolidation Coal Co.*, 188 F.3d 998, 1001 (8th Cir. 1999) ("The parties could easily have made the GIC obligatory by using mandatory language, such as 'must and shall' rather than 'may and should.'").

Second, Soueidan's allegation that the Handbook provided that "students are to meet with their advisor in January to complete their Annual Student Review," Compl. at 6, ¶ 29 (citing Handbook at 9), creates no obligation on SLU's behalf. This alleged promise is dependent on the Handbook's prior statement that the student "should have an advisor assigned." *Id.* at 6, ¶ 27 (quoting Handbook at 9). Furthermore, Soueidan has not alleged that the Handbook says that the advisors "must" or "shall" meet with the students; instead, he alleges that the Handbook places the onus on the students to meet with their advisor.[4] Therefore, the Handbook language, as Soueidan alleges that it reads, indicates more of a recommendation or goal and is "aspirational in nature." *See Lucero*, 400 S.W.3d at 6.

Third, the Handbook's statement that "'[f]or Engineering students, the Qualifying Exam is scheduled after 2 semesters,'" Compl. at 6, ¶ 31 (quoting Handbook at 12), does not constitute an obligation that SLU owed to Soueidan. As with the two prior provisions, the cited language contains no mandatory language that the Qualifying Exam "must" or "shall" be scheduled within two semesters. And, the provision does not say *who* schedules the Qualifying Exam.

In addition to the Handbook, Soueidan's complaint alleges that the Catalog "indicates that the Parks College of Engineering does in fact have a Ph.D. program." *Id.* at 7, ¶ 33 (citing Catalog at 111). Like the Handbook, the Catalog does not affirmatively set forth any obligation on behalf of SLU. Soueidan has cited no mandatory language from the Catalog guaranteeing that Soueidan will earn his Ph.D. degree in a certain number of years or earn the degree at all.

---

[4]Soueidan's complaint did not directly quote the actual language from the Handbook; however, nowhere does he indicate that the Handbook uses mandatory language.

If we "wade[d] into the issue of how closely [SLU] operated within the constructs of the . . . aspirational [Handbook and Catalog] provisions cited by [Soueidan], [we] would be forced to engage—with complete disregard for Missouri law—in an educational malpractice analysis rife with . . . practical and policy concerns." *Gillis v. Principia Corp.*, 111 F. Supp. 3d 978, 985 (E.D. Mo. 2015), *aff'd*, 832 F.3d 865 (8th Cir. 2016). As the district court aptly explained, Soueidan's claims would impermissibly require it "to determine whether SLU timely assigned a Ph.D. advisor, conducted a student review, and scheduled the qualifying examination and how those decisions affected Soueidan's matriculation"; "to analyze whether SLU breached its contract by 'failing to award . . . Soueidan the Ph.D. degree he was promised after completing all directives and 5 years of requisite coursework'"; and "to address not only the quality of the Ph.D. program but also whether Soueidan comprehensively and adequately completed all of his coursework." *Soueidan*, 2018 WL 1997287, at *3 (ellipsis in original) (quoting Compl. at 8, ¶ 39). Such "intervention by the court would amount to judicial supervision of [SLU's] internal procedures for monitoring" the progress of its doctoral students." *Lucero*, 400 S.W.3d at 8 ("With this purpose in mind, any intervention by the court would amount to judicial supervision of a university's internal procedures for monitoring its faculty.").

Accordingly, we affirm the district court's dismissal of Soueidan's claims based on the educational malpractice doctrine.

## B. *Request for Leave to Amend Complaint*

Soueidan also challenges the district court's denial of his request for leave to amend his complaint. Soueidan conditionally requested leave to amend his complaint in his response to SLU's motion to dismiss. Soueidan did not disclose what he would change in the complaint, nor did he attach a proposed amended pleading or file a separate motion for leave to amend. The district court denied Soueidan's request to

file an amended complaint "because he . . . failed to provide a proposed amendment along with his request." *Soueidan*, 2018 WL 1997287, at \*5.

Soueidan argues that the district court abused its discretion in denying his request for leave to amend his complaint. *See Wolgin v. Simon*, 722 F.2d 389, 394 (8th Cir. 1983) (standard of review). We addressed a substantially similar situation in *Wolgin*. In that case, the appellant, "[i]n his *brief in opposition to the appellees' motion to dismiss*, . . . concluded his argument by *requesting leave to amend the complaint* if the court granted the appellees' motion." *Id.* (emphases added). The appellant contended that the district court construe the request "as a motion for leave to amend." *Id*. We rejected the appellant's argument based on his failure to preserve the right to amend by submitting a proposed amendment with a motion. *Id.* at 394–95.

Soueidan attempts to distinguish *Wolgin* by arguing that the appellant in that case filed a motion for leave to amend pursuant to Federal Rule of Civil Procedure 15(a), while Soueidan did not file a Rule 15(a) motion but rather only sought permission to file a Rule 15 motion. Contrary to Soueidan's argument, the appellant in *Wolgin* did precisely what Soueidan did here—"concluded his argument [in his brief in opposition] by requesting leave to amend the complaint if the court granted the appellees' motion." *Id.* at 394. As a result, *Wolgin* is controlling. We, therefore, hold that the district court did not abuse its discretion in denying Soueidan leave to amend when Soueidan "did not submit a proposed amendment to the trial court, nor [include] anything in [his] brief to indicate what an amended complaint would have contained." *Id.*[5]

-------

[5]Even if Soueidan were allowed to amend his complaint, such amendment would be futile. *Plymouth Cty., Iowa v. Merscorp, Inc.*, 774 F.3d 1155, 1160 (8th Cir. 2014) ("[A] party is not entitled to amend a complaint without making a showing that such an amendment would be able to save an otherwise meritless claim."). Soueidan argues his amended complaint would "add an allegation that he looked at the

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

————————————————

————————————

Handbook at the time he enrolled or that the Handbook terms were in existence at that time" to remedy the district court's conclusion that Soueidan's contract claims failed because Soueidan could not have relied upon alleged promises set forth in the Handbook and Catalog that he received *after* he formed his alleged 2012 contract with SLU. Appellant's Br. at 31. Additionally, he asserts he would "clarify that the representation that there is a Ph.D. program at all, through which any student can obtain a Ph.D., is distinct from a promise to provide a Ph.D. within a certain timeframe so long as he followed certain steps, and was a representation made at the time he applied for the program." *Id*. But these amendments would not remedy the fact that the educational malpractice doctrine bars Soueidan's claims.