85 So.2d 34

James E. KALSHOVEN

v.

LOYOLA UNIVERSITY.

No. 41495.

Jan. 16, 1956.

John P. Dowling, Leonard L. Dreyfus, New Orleans, for appellant.

Charles I. Denechaud, Jr., John T. Charbonnet, Frank D. Tournier, New Orleans, for defendant-appellee.

HAMITER, Justice.

James E. Kalshoven, alleging a breach by Loyola University of his two written contracts of employment, seeks a judgment against such defendant for $38,837.80, this amount representing claimed salaries due and resulting damages. The petition recites, among other things, that "in discharging your petitioner the defendant acted in an arbitrary, capricious and summary man-

ner". The suit was dismissed by the district court, after a trial on the merits, and plaintiff is appealing.

On April 11, 1949 plaintiff, who had been employed by the defendant since 1945 as a teacher, executed the two contracts with the university. In one he engaged to: "Teach in the Department of English and Speech of the College of Arts and Sciences; to serve as technical supervisor of the weekly newspaper of the party of the first part [defendant] which is known as the Loyola Maroon." In the other he agreed to: "Provide publicity service, and public relations service to the extent possible under his other obligations to the university." The engagements were to commence on September 1, 1949 and to endure for terms of four years and of three years and ten months, respectively. (Brackets ours.)

Paragraphs 3 and 7 of both contracts contained identical provisions, as follows: "(3) * * * The University shall, at all times be the judge of the competency, ethics, and conduct of the party of the second part, and may terminate this agreement at any time for serious failure in any of the foregoing by the party of the second part. Should such termination of this agreement be determined upon by the University it shall so notify the party of the second part of the termination of this agreement and pay to him his earned salary to date, and unearned salary for one month.

\* \* \* \* \* \*

"(7) In the event that the party of the second part wishes to terminate this agreement, he must notify his dean and regent in writing at least six months in advance of the date on which he wishes this to terminate. In the event that the University wishes to terminate this agreement *because of organizational adjustment or of circumstances deemed by the University to be grave, except as provided for in paragraph (3) of this agreement,* written notice must be given to the party of the second part at least six months in advance of the date on which the University wishes this to terminate. * * *" (Italics ours.)

In January, 1951 (evidently January 16), in a letter written by Reverend Thomas J. Shields, S. J., President of the University, the plaintiff was requested to resign. On January 18, 1951, he (apparently after having orally contacted university officials concerning the request and the reasons therefor) addressed a lengthy communication to Father Shields outlining his position on some of the complaints made against him and declining to tender his resignation. To it the president replied on January 29, 1951 that plaintiff appeared to consider the request to resign as having been based on paragraph 3 of the contracts (this provided for immediate dismissal), whereas, actually, it was predicated on paragraph 7 thereof; and that plaintiff, in accordance with the latter paragraph, was thereby notified of the university's intention to terminate the two employment agreements on July 31,

1951 (six months from the date of the notice).

Approximately a month later (February 28, 1951) plaintiff, on the written request of his attorney, was furnished in writing by Father Shields definite specifications of the dismissal grounds; also, his salary for the mentioned six months' period was sent to him. This suit followed.

The defendant seems to admit that the contracted publicity service was satisfactorily rendered. As shown by Father Shields' letter of February 28, 1951, which furnished definite specifications of the dismissal grounds, the defendant complained that plaintiff, by his own admissions, had experienced personal difficulties in working with certain university officials. Also in that letter charges were set forth which reflected on plaintiff's capacity as a teacher and on his capability in performing his work in public relations. And during the course of the trial much evidence was introduced for the purpose of showing such personal difficulties and, further, that the plaintiff had improperly conducted his classes and public relations assignments and was otherwise incompetent and negligent in the performance of his duties in connection therewith.

Our careful examination of the record presented reveals complete sincerity in the testimony of the witnesses for the defendant and also in that of plaintiff's witnesses. It furnishes the conviction that all of those testifying, for both litigants, were attempting to give a true and fair picture of the situation as they saw it.

Be that as it may, on our analysis of the evidence we cannot conclude that the charges of incompetence and negligence in the performance of plaintiff's duties have been preponderately substantiated. However, as already indicated, the dismissal was not based on paragraph 3 (of the contracts) which provided for an immediate termination of the employment and related to a serious failure in "competency, ethics and conduct"; it was predicated on paragraph 7. The latter afforded plaintiff the right, on giving six months' notice, to cancel the agreements for any reasons, or for no reason at all. Likewise, the university could terminate them, on giving the same notice, "because of organizational adjustment *or* of circumstances *deemed by the University* to be grave, *except* as provided for in paragraph (3)." (Italics ours.)

Plaintiff concedes that there existed a serious conflict between himself and Father George T. Bergen who became Dean of the School of Arts and Sciences, and also plaintiff's immediate superior, a short time after the commencement of the terms provided for in the agreements. The journalism course which plaintiff taught originally, as well as the Department of Journalism which he subsequently headed, were under the administration of Father Bergen as dean of the mentioned school; therefore, he was directly responsible to Father Bergen in the performance of his journalism

assignments. And the conflict became irreconcilable in spite of the efforts of others (primarily Father Shields) to placate the situation. It even proceeded to the point of "open antagonism". Likewise, plaintiff admits that in the field of public relations he had a series of personal conflicts with certain other deans and department heads.

It is shown by the record also that the action of the university, in requesting the plaintiff to resign and in later dismissing him on six months' notice, did not occur hastily and without due consideration. It was taken only after defendant's board of directors had made a thorough investigation and had considered the matter on numerous occasions.

As pointed out above, plaintiff could terminate the contracts at will and the university was given the privilege of ending them for circumstances which *it* deemed to be grave. The determination made by the defendant after considerable investigation and deliberation, that the personal difficulties shown above (the existence of which plaintiff admitted) were of a grave nature and not to the best interest of the school, does not appear to have been an arbitrary and capricious act as plaintiff contends. This conclusion seems inescapable, particularly since it is generally known that conflicts and antagonisms of that nature within an educational institution adversely affect the morale of both the student body and faculty and could eventually lead to a lowering of scholastic standards.

Most assuredly, we are not warranted in this cause, in view of the circumstances mentioned, in substituting our judgment for that of the members of the board of directors of Loyola University who undoubtedly acted in the utmost good faith and whose prerogative it was to make the determination under the provisions of the contracts.

For the reasons assigned the judgment appealed from is affirmed.