# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 11, 2022

Lyle W. Cayce
Clerk

No. 21-30681

---

SYLVIA JONES, *on behalf of herself and all others similarly situated*,

*Plaintiff—Appellant*,

*versus*

ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND, *doing business as* TULANE UNIVERSITY OF LOUISIANA, *also known as* TULANE UNIVERSITY,

*Defendant—Appellee*,

---

JOHN ELLIS, *on behalf of himself and all other individuals similarly situated*,

*Plaintiff—Appellant*,

*versus*

TULANE UNIVERSITY,

*Defendant—Appellee*.

---

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:20-cv-2505, 2:20-cv-2518

---

Before Smith, Clement, and Haynes, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

Two former students of Tulane University, on behalf of a putative class of current and former students, sued the University for failing to provide a partial refund of tuition and fees after Tulane switched from in-person instruction with access to on-campus services to online, off-campus instruction during the COVID-19 pandemic. The district court agreed with Tulane that the students' complaint should be dismissed for failure to state a claim. For the following reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.

## I. BACKGROUND

## A. FACTUAL ALLEGATIONS

We recite the well-pleaded facts as alleged in the Consolidated Complaint, viewing them in the light most favorable to the plaintiffs.[1]

Tulane University is a private university in New Orleans, founded over 170 years ago. In its advertising materials, the University touted the benefits of living on and studying at its campus location: "[W]hen you choose to study here, you're not just choosing a campus. You're choosing a place to live and work. . . . That means your education is inextricably tied to the world around you." Among its advertised facilities and services were Tulane's "on-campus gym," a state-of-the-art recreational facility; the physical facilities that are "a focal point for campus life"; the "theatrical performances, concerts and speakers on campus throughout the year"; the "on-campus clinic, pharmacy and counseling staff"; the "many ways to get involved on campus"; and the campus's "convenient[] locat[ion] across the

---

[1] *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 253 (5th Cir. 2021) (per curiam).

street from" Audubon Park. The University advertised an in-person, on-campus life associated with its offer of educational instruction.

In the 2019–2020 academic year, Tulane offered instruction to over 14,000 students across ten constituent schools. Historically, the University has provided in-person, on-campus services for most programs and online instruction for some programs. Under Tulane's credit hour policy, students enrolled in in-person courses receive "one academic hour (50 min) of contact time each week [per credit hour] . . . for the full academic semester." Students enrolled in online courses were not promised "contact time" but, rather, a commensurate "amount of content and/or student effort." At enrollment each semester, including the Spring 2020 semester, students had access to Tulane's course catalog, which specified instruction in each class at certain times and at specific campus locations.

According to the Consolidated Complaint, Tulane typically charged substantially less for its online course offerings than for in-person tuition. For example, for the Spring 2020 semester, residential undergraduate students paid $2,199 per credit hour for in-person classes at the School of Professional Advancement. Online students paid $476 per the equivalent credit hour.

The University also charged certain fees each semester, including:

- An academic service fee of $1,400 for "access to the University's computer services, data, voice, and internet hook-ups, . . . tutoring and counseling services, on-line library, inter loan services and other support services, such as, the language and science laboratories[.]"

- A student activity fee of $120 for "students to participate in or attend supported activities . . . and admission to many events, movies, and lectures."

No. 21-30681

- A campus health fee of $320 for "access to primary care, preventive care, [ ] medical referrals at the Health Center[,] . . . counseling services, mental health care coordination, health education programs, drug/alcohol counseling, and Tulane Emergency Medical Services."

- A student recreation center fee of $180 for "membership to the Reily Recreation Center."

- And "supplemental fees per course," such as "laboratory" fees, charged "to cover the costs of materials and supplies consumed."

On March 11, 2020, Tulane announced that "[a]ll classes will be conducted online beginning Monday, March 23 through the end of the semester." Some classes moved into a video format. Other classes converted to self-study, some with recorded videos and some without. On or about March 13, the University stopped providing access to all on-campus services and facilities and told students to move out of their residential halls. Tulane did not refund any amount of tuition or fees.[2]

Plaintiff John Ellis was an undergraduate student during the Spring 2020 semester. He paid approximately $26,380 for residential tuition and more than $1,900 in fees. Plaintiff Sylvia Jones was a graduate student in the A.B. Freeman School of Business during the Spring, Summer, and Fall 2020 semesters. In the Spring 2020 semester, she paid $26,380 for residential tuition and $1,400 in fees. Both Ellis and Jones alleged that they have not received a refund of any tuition or fees.

---

[2] Tulane claims it issued a 40% rebate on residential housing and dining fees for the Spring 2020 semester, but those fees are distinct from the fees challenged in the Consolidated Complaint.

No. 21-30681

## B. DISTRICT COURT PROCEEDINGS

In September 2020, Plaintiffs Ellis and Jones each sued the Administrators of the Tulane Educational Fund, seeking partial refunds for tuition and fees. In November, Tulane moved to dismiss each suit, arguing that the plaintiffs had signed an express, fully-integrated contract that foreclosed their claims. Before the district court ruled on the motions, the suits were consolidated. In December, Plaintiffs Ellis and Jones, on behalf of a putative class of current and former students[3] (collectively, the Students), filed the Consolidated Complaint. The Consolidated Complaint alleged that Tulane breached its contract with the Students by retaining the full amount of pre-paid tuition and fees for the Spring 2020 semester[4] but failing to provide the previously bargained for in-person, on-campus services. The Students also alleged unjust enrichment and conversion claims. They seek damages.

Tulane moved to dismiss the Consolidated Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, urging again that the Students had signed an express, fully-integrated contract that governed the University's commitment to provide refunds. Tulane also argued that the Students' breach-of-contract claim was barred as a claim of educational malpractice; that the claim of unjust enrichment failed for lack of an

---

[3] The class as defined in the Consolidated Complaint is: "Any person who paid or caused to be paid tuition and/or fees to attend Tulane University when classes and/or coursework were limited in whole or in part to online attendance as a result of or in connection with COVID-19."

[4] We focus our analysis on the Spring 2020 semester, but the Students also seek refunds for the Summer 2020 and Fall 2020 semesters. Tulane contends that the Students cannot obtain a refund for the Summer and Fall semesters because the Students enrolled in courses with the knowledge that their instruction would be affected by the ongoing pandemic. We leave that question to the district court to review in the first instance. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).

5

No. 21-30681

allegation that Tulane's retention of the pre-paid tuition and fee money was unjustified; and that the claim of conversion failed because the Students ratified the educational instruction they received. The Students opposed and sought leave to amend.

The district court denied the motion to amend and dismissed all claims with prejudice. Assuming without deciding that the Students had plausibly alleged a promise of in-person instruction and on-campus services, the district court found that the breach-of-contract claim was barred under Louisiana law as a claim of educational malpractice. The court dismissed the claims of unjust enrichment and conversion for failure to plausibly allege that Tulane's decision to transition to online instruction was unjust or tortious. The Students timely appealed the order.[5]

## II. STANDARD OF REVIEW

We review a grant of dismissal under Rule 12(b)(6) for failure to state a claim *de novo*. *Petrobas Am.*, 9 F.4th at 253. A complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This does not amount to a specific probability, but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint need not contain "detailed factual allegations," alleging facts "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility[.]'" *Id.* (quoting *Twombly*, 550 U.S.

---

[5] The Students have abandoned their appeal of the district court's denial of leave to amend the Consolidated Complaint by failing to argue the issue in the body of their brief. *See* FED. R. APP. P. 28(a)(8)(A); *Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir. 1990).

at 557).  We construe the complaint in the light most favorable to the plaintiffs.  *Petrobas Am.*, 9 F.4th at 253.

## III. DISCUSSION

## A. BREACH-OF-CONTRACT CLAIM

The thesis of the Students' breach-of-contract claim is that Tulane breached material terms of the parties' contract for educational services by failing to provide in-person instruction and on-campus facilities but retaining the pre-paid tuition and fees.

*First*, we hold that the claim is not barred as a claim of educational malpractice because the Students do not challenge the quality of the education received but the product received.  *Second*, we reject Tulane's argument that the breach-of-contract claim is foreclosed by an express agreement between the parties, because the agreement at issue plausibly does not govern refunds in this circumstance.  And *third*, we conclude that the Students have not plausibly alleged that Tulane breached an *express* contract promising in-person instruction and on-campus facilities because the Students fail to point to any explicit language evidencing that promise.  But we hold that the Students have plausibly alleged implied-in-fact promises for in-person instruction and on-campus facilities.  We reverse the district court's dismissal of the Students' implied-in-fact contract claims for tuition and certain fees.

## 1. EDUCATIONAL MALPRACTICE BAR

The district court dismissed the breach-of-contract claim for "morph[ing] into an educational malpractice claim seeking damages for a

mode of educational instruction with which [the Students] are unsatisfied." The district court erred.

As a general rule, "Louisiana law does not recognize a cause of action for educational malpractice under contract or tort law." *Miller v. Loyola Univ. of New Orleans*, 2002-0158 (La. App. 4 Cir. 9/30/02), 829 So. 2d 1057, 1061, *writ denied*, 2002-3093 (La. 3/14/03), 839 So. 2d 38. That is because a court's evaluation of the quality of educational content that a student received threatens to infringe the institution's "academic freedom and autonomy." *Id.* at 1060 (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 415 (7th Cir. 1992)). But "[n]otwithstanding the strong public policy of judicial restraint in disputes involving academic standards, the decisions of educators are not completely immune from judicial scrutiny." *Guidry v. Our Lady of the Lake Nurse Anesthesia Program Through Our Lady of the Lake Coll.*, 2014-0461 (La. App. 1 Cir. 1/29/15), 170 So. 3d 209, 215.

Where a student can establish "a specific, identifiable agreement for the provision of particular services," the university remains liable. *Miller*, 829 So. 2d at 1060. For example, a claim that the university "took tuition money" based on the "promise[] [of] a set number of hours of instruction and then failed to deliver" could be a viable breach-of-contract claim. *Id.* (quoting *Ross*, 957 F.2d at 417). Claims "that the institution failed to perform [a promised] service at all" do "not require an inquiry into the nuances of educational processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise." *Id.* (quoting *Ross*, 957 F.2d at 417). Although, when challenging "the substance of genuinely academic decisions," plaintiffs must additionally show that the "institution exercise[d] its discretion in an arbitrary or irrational fashion." *Guidry*, 170 So. 3d at 214–15.

Tulane contends that the Students' breach-of-contract claim is barred because it challenges the quality of the education received and, in the alternative, that the Students must allege Tulane acted arbitrarily or irrationally.  We disagree with both contentions.

First, the Students do not challenge the quality of the education received but allege that Tulane undertook a specific, identifiable agreement for the provision of particular services—that is, for the provision of in-person instruction and on-campus facilities.  *See Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 882–83 (7th Cir. 2022) (holding that similar breach-of-contract claim was not a claim of educational malpractice because the plaintiffs did not "attack [ ] the quality of the remote education [they] received" but "an identifiable contractual promise that the university failed to honor—the promise to provide in-person classes and access to on-campus facilities and resources").  According to the Consolidated Complaint, in-person instruction was a material term of the contract for educational services, and remote instruction was not the product purchased.

We also reject Tulane's contention that the Consolidated Complaint challenges a purely academic decision and that the Students must, therefore, allege that Tulane acted arbitrarily and capriciously by failing to provide pro-rated refunds.  Deciding whether Tulane breached its agreement to provide in-person instruction and on-campus access to facilities in exchange for pre-paid tuition and fees does not implicate educational questions best left to professional academic judgment.  Courts act well within their expertise when answering the elementary question whether a contract was made and breached.

Tulane urges that the calculation of damages will ultimately force an evaluation of the quality of Tulane's online instruction, which is barred by the educational malpractice doctrine.  That argument is premature at this

early stage of the litigation. With discovery, the students may be able to support a calculation of damages based not on any subjective evaluation of the quality of the online instruction received but on metrics such as Tulane's preestablished disparate pricing of in-person and online instruction or on market value. *See Shaffer v. George Washington Univ.*, 27 F.4th 754, 765 (D.C. Cir. 2022) (holding that determining damages on the facts alleged "does not require [the] court to subjectively value the quality of [the] education" because "the Universities *themselves* apparently charge different rates for online and in-person instruction").

We hold that the Students' breach-of-contract claim is not barred as a claim of educational malpractice, and the Students do not need to allege that Tulane acted arbitrarily or capriciously because they do not challenge a genuinely academic decision.

## 2. AGREEMENT & DISCLOSURE STATEMENT

Under Louisiana law, "there can be no implied contract where there is an express contract between the same parties in reference to the same subject matter." *Okuarume v. S. Univ. of New Orleans*, 2017-0897 (La. App. 4 Cir. 4/25/18), 245 So. 3d 1260, 1265, *writ denied*, 2018-0880 (La. 9/28/18), 252 So. 3d 927 (citation omitted). Tulane contends that the Students fail to plausibly allege a contract promising in-person instruction and on-campus facilities because the Students signed an express, "fully-integrated, unambiguous contract" that "specifically sets forth the terms governing refunds of tuition and fees." The Students respond that the asserted express contract is not properly before us and, even if it were, it is not the entire agreement between the parties.

According to Tulane, students sign an Agreement and Disclosure Statement (A&DS) at enrollment and reaffirm their acceptance at the start of each semester. The A&DS establishes an "open-end account with

Tulane" and provides a "statement of the terms and conditions of that account, as well as a statement of [the student's] rights and responsibilities regarding that account." Under the terms of the A&DS, students must pay "all Charges" or "[r]egistration for any semester may be denied" as well as diplomas and transcript requests. In order "[t]o obtain a remission of tuition, the student must drop the courses online or complete drop/add form(s) with Academic Advising. Tuition will be reduced based on the date of withdrawal." As for the fees charged, "[f]ees are not refundable" and "are due from the student regardless if services are utilized."

In the court below, the Students objected to consideration of the A&DS on the basis that the agreement was outside the four corners of the complaint because it was not attached to, referenced in, or central to the complaint. The district court did not rule on the objection. We hold that the A&DS is properly before us.

"Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). And the court must give "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* Summary judgment is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

11

The Students first argue that the district court erred because it failed to give an opportunity for response. But Tulane attached the A&DS to its motions to dismiss before the individual suits brought by Plaintiffs Ellis and Jones were consolidated. The Students were on notice and had the opportunity to address the A&DS in the Consolidated Complaint. They chose not to do so.

We also reject the Students' contention that the A&DS is not central to their claims. The text of the agreement expressly discusses four of the five fees challenged in this suit and offers some parameters on refunds. At a minimum, the A&DS is central to the Students' breach-of-contract claim regarding those four fees charged.

With the A&DS properly before us, we consider Tulane's argument that the agreement expressly addresses and forecloses the Students' claims because it is a "fully-integrated, unambiguous contract" that "specifically sets forth the terms governing refunds of tuition and fees."

Under Louisiana law, "[a] contract is significantly different from an open account." *Signlite, Inc. v. Northshore Serv. Ctr., Inc.*, 2005-2444 (La. App. 1 Cir. 2/9/07), 959 So. 2d 904, 907. "Louisiana courts . . . define an open account as 'an account which . . . is still running or open to future adjustment or liquidation,'" "similar to a line of credit." *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 174 (5th Cir. 2007) (first quoting *Open Account*, BLACK'S LAW DICTIONARY 18 (6th ed. 1990), then quoting *Hayes v. Taylor*, 2001-1430 (La. App. 3 Cir. 3/27/02), 812 So. 2d 874, 878)). And an open-end account "necessarily involves an underlying agreement between the parties on which the debt is based." *Union Christian Acad. v. Shirey*, No. 53,831 (La. App. 2 Cir. 4/14/21), 2021 WL 1396400, at *3.

The A&DS only purports to create the "open-end account[, which] is the instrument through which Tulane will process all of [the student's] financial transactions with Tulane University." Its provisions cover "the terms and conditions of that account, as well as a statement of [the student's] rights and responsibilities regarding that account." It does not purport to constitute a contract for educational services at all, much less a fully-integrated contract. For example, the A&DS nowhere identifies Tulane's commitment to provide educational instruction or the essential terms of that instruction. *See King v. Baylor Univ.*, No. 21-50352, 2022 WL 3592114, at *12 (5th Cir. Aug. 23, 2022) (holding that "Financial Responsibility Agreement" was a fully-integrated contract that explicitly included essential terms for the provision of "educational services"). Nor does the A&DS purport to constitute the entire agreement between the parties. *Cf. Dean v. Chamberlain Univ., LLC*, No. 21-3821, 2022 WL 2168812, at *2 (6th Cir. June 16, 2022) (holding that "Enrollment Agreement" constituted a fully-integrated contract for educational instruction because it explicitly "constitute[d] the entire agreement between the parties with respect to education services").

There is an additional reason that we cannot hold at this stage that the A&DS precludes the Students' claims as a matter of law: the record does not establish that the Students agreed to the A&DS. Tulane offers screenshots of internal records reflecting that the Students web-confirmed a "User Registration Confirmation," but the record does not establish what the User Registration Confirmation is and whether it includes the Agreement and Disclosure Statement. Tulane also provides screenshots that purport to recreate the web page where students affirm their agreement to the A&DS each semester. But this screenshot also does not show that the Students saw and agreed to the terms of the A&DS. The screenshot text does not include the terms of the A&DS nor link to the terms of the A&DS. Thus, we cannot rely on the A&DS as preclusive of the Students' claims as a matter of law.

We hold that the Students plausibly alleged that the A&DS is not the entire agreement between the parties and does not squarely govern their breach-of-contract claim.

## 3. EXISTENCE OF A CONTRACT

Now, we determine whether the Students plausibly alleged a contract with Tulane for the provision of in-person instruction and on-campus facilities.

Breach of contract requires a showing that "(1) the obligor[] undert[ook] an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So. 3d 1099, 1108–09, *writ denied*, 2011-0636 (La. 5/6/11), 62 So. 3d 127. Contracts may be express or implied. *See* RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a (Am. L. Inst. 1981). Under Louisiana law, "[a]n implied in fact contract is one which rests upon consent implied from facts and circumstances showing mutual intention to contract." *Morphy, Makofsky & Masson, Inc. v. Canal Place 2000*, 538 So. 2d 569, 573 (La. 1989). "Consent to an obligation may be implied from action only when circumstances unequivocally indicate an agreement or when the law presumes it." *Union Tex. Petrol. Corp. v. Mid La. Gas Co.*, 503 So. 2d 159, 165 (La. Ct. App.), *writ denied sub nom. Union Tex. Petrol. Corp. v. Mid La.*, 506 So. 2d 1228 (La. 1987).

We easily determine that the Students have not plausibly alleged an *express* contract with Tulane for in-person instruction and on-campus facilities because the Students point to no explicit language providing those terms. *See Willis v. Melville*, 19 La. Ann. 13, 14 (1867). But, accepting the factual allegations in the Consolidated Complaint as true and drawing all reasonable inferences from those allegations in the Students' favor, we hold that the Students have plausibly alleged an *implied-in-fact* contract with

Tulane for in-person instruction and on-campus facilities in exchange for tuition and fees money. We address the alleged promises to provide tuition and fees separately.

### A. IMPLIED-IN-FACT CONTRACT FOR FEES

Up first is Tulane's promise to provide certain on-campus facilities and services in exchange for retaining the following fees: the Academic Support Services fee, the Student Health Center charge, the Student Activity fee, the Student Recreation Center fee, and the Supplemental Course fees.

Each of these fees purports to cover on-campus activities that were allegedly inaccessible once Tulane told students to leave campus. The Academic Support Services fee covered "access to the University's computer services, data, voice, and internet hook-ups, . . . tutoring and counseling services, on-line library, inter loan services and other support services, such as, the language and science laboratories." The Student Health Center fee promised "access to primary care, preventive care, [ ] medical referrals at the Health Center[,] . . . counseling services, mental health care coordination, health education programs, drug/alcohol counseling, and Tulane Emergency Medical Services." The Student Activity fee paid for "students to participate in or attend supported activities . . . and admission to many events, movies, and lectures." The Student Recreation Center fee paid for "membership to the Reily Recreation Center." And the Supplemental Course fees covered "materials and supplies consumed" in courses with a "laboratory" or similar component. We draw the reasonable inference from these descriptions that these fees were associated with access to on-campus facilities and that, after Tulane evacuated the campus, the Students lost access to the services that these fees covered. The Students plausibly allege that they paid for services that Tulane failed to provide and that the Students may be entitled to a partial refund.

Tulane argues that the A&DS precludes the Students from receiving a partial refund of the first four fees challenged because the agreement provides that those "fees . . . are not subject to dispute[,] are due from the student regardless if services are utilized," and "are not refundable." But, as noted, the record does not establish that the Students agreed to the A&DS. Moreover, the language of the A&DS is ambiguous. That fees would be retained "regardless if services *are utilized*" does not mean that fees would be retained regardless if services *are provided*. It stretches reality that the Students agreed to pay money for a service not delivered at all. And the A&DS contains no reservation of rights to fail to offer the services *and* still charge for it. The Students plausibly allege that when Tulane charged a fee for services, it promised to provide them.

## B. IMPLIED-IN-FACT CONTRACT FOR TUITION

Next, we turn to the implied promise to provide in-person instruction. Louisiana law teaches that "[a] contract between a private institution and a student confers duties upon both parties, which . . . may be judicially enforced." *Guidry*, 170 So. 3d at 213-14. But because "[t]he terms of the contract are rarely delineated," education contracts are distilled from "the catalogs, bulletins, circulars, and regulations of the university made available to the student[, which] become part of the contract" between the student and the institution. *Id.* at 213.

The Students argue that they bargained for and paid for in-person instruction in reliance on the course catalog stating the location of classes on campus, credit hour policy specifying certain "contact time" per credit hour, offering of online and in-person programs as distinct products, marketing and admissions materials describing the campus and instruction, and the University's historical practice of providing in-person instruction. We agree

No. 21-30681

that these sources considered together support the plausible inference that Tulane agreed to provide in-person instruction.

*First*, the Students allege that they elected classes for the Spring 2020 semester in reliance on promises in Tulane's 2019–2020 course catalog, which the University provided on its course registration portal. According to the Students, the course catalog indicated in-person instruction by expressly offering classes at set times at specific on-campus locations.

Tulane argues that course catalogs merely create expectations, not promises. But, under Louisiana law, a course catalog may support a breach-of-contract claim. *See Guidry*, 170 So. 3d at 213; *but see Miller*, 829 So. 2d at 1062.[6]

Tulane next argues that the course catalog expressly reserved to the University "the right to change any of its rules, courses, regulations, and charges without notice and to make such changes applicable to students already registered as well as to new students." But Tulane cites to a distinct version of the course catalog, which lacks the alleged details specifying the time and location of the courses offered. And, according to the students, the reservation language at issue did not appear in the 2019-2020 course catalog

---

[6] In *Miller*, the Fourth Circuit Court of Appeal of Louisiana held that a "course bulletin cannot be looked upon as [a] contractual provision that gives students opportunity to sue the school if they feel that their expectations are not met or if the course does not fit the description exactly." 829 So. 2d at 1062. But the First Circuit Court of Appeal of Louisiana expressly "disagree[d] with the [*Miller* Court's] broad characterization that course descriptions are not binding contractual provisions." *Guidry*, 170 So. 3d at 213 n.4. Read in context, the *Miller* Court concern over course descriptions focused on a challenge to the quality of the education received based on the *content* of the instruction as described in the course catalog. *Miller*, 829 So. 2d at 1062. The lesson we take from *Miller* is the uncontroversial principle that students cannot bring educational malpractice claims disguised as breach-of-contract claims. The Students do not run afoul of *Miller*. They rely on the course catalog for the allegedly material promise of in-person instruction, which they plausibly allege is different in kind from a university's modification of the class syllabus.

provided on the Course Registration portal. Tulane does not establish otherwise. The parties' dispute over whether this reservation of rights was ever provided to the students is best resolved by the district court.

We also leave to the district court to determine in the first instance whether this reservation of rights reasonably covers the COVID-19 pandemic because the asserted language does not clearly contemplate a fundamental change to the structure of an in-person course to an online course and does not clearly contemplate force majeure events outside of the University's control. *See Gociman*, 41 F.4th at 884 (holding that, at the motion-to-dismiss stage, a similar reservation "[did] not overcome a reasonable inference that the course catalog implie[d] in-person instruction"); *Shaffer*, 27 F.4th at 765 (rejecting that a similar reservation, which "[did] not specifically address emergencies or other *force majeure* events[,] . . . must as a matter of law be viewed by a reasonable person as allocating the entire financial consequences of the pandemic change to online classes to the students"); *Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d 44, 51 (D. Del. 2021) (Bibas, J., sitting by designation) ("[T]here is some implied limit on the school's freedom to change its teaching," even though "universities have wide latitude to change course details"). *Compare Dean*, 2022 WL 2168812, at *2–3 (holding that reservation specifically addressing "natural occurrences or other circumstances *beyond [the institution's] control*" established that university did not promise in-person teaching and clinical experience).

*Second*, Tulane's credit hour policy supports the inference that the University promised in-person education in exchange for retaining tuition payments. The credit hour policy distinguished between "courses taught in lecture format" and "courses taught in other than lecture format (e.g., seminars, laboratories, independent study, clinical work, research, online courses, etc.)." For courses in "lecture format," the University Catalog Glossary promised fifty minutes of "contact time" and one-to-two hours of

effort "outside the classroom" per week per credit hour. For courses taught "in other than lecture format," the Glossary promised only a commensurate "amount of content and/or student effort" per week per credit hour. According to the Glossary, this "standard definition of a credit hour applies across the University."

*Third*, Tulane allegedly packaged online tuition as a product separate and distinct from in-person tuition and offered online programs at a significantly cheaper cost than in-person programs. We can reasonably infer that "the higher tuition . . . [is] based, at least in part, on access to in-person instruction and on-campus facilities and resources." *Gociman*, 41 F.4th at 885. Tulane urges us to reject any inference based on price disparities because it contends that it does not offer cheaper, online counterparts for each of its in-person programs. But Tulane fails to explain why cheaper, online counterparts will be necessary for the Students to prevail on their breach-of-contract claim. *See, e.g.*, *Shaffer*, 27 F.4th at 764 (comparing the price of the on-campus undergraduate program with the cheaper price of the university's specialized programs "only offered online"). The Students plausibly alleged that in-person instruction was key to the bargain—which is supported by Tulane's advertising of online and in-person instruction as distinct products—and that Tulane failed to carry out its end of the bargain to deliver the paid-for in-person instruction.

*Fourth*, we draw the reasonable inference from the factual allegations in the Consolidated Complaint that Tulane has established a historic practice of providing in-person instruction to students who pay the cost of residential tuition. The Students alleged that they relied on this historic custom of in-person instruction when agreeing to enroll. *See Shaffer*, 27 F.4th at 764 (recognizing "historic practice" supported plausible allegation of promise of in-person instruction); *Ninivaggi*, 555 F. Supp. 3d at 51 (same). Under Louisiana law, the conduct of the parties informs an unclear contract like this

one. *See* LA. CIV. CODE art. 2053; *Kenner Indus., Inc. v. Sewell Plastics, Inc.*, 451 So. 2d 557, 560 (La. 1984).

*Fifth*, Tulane's marketing materials advertised the benefits of its in-person education and on-campus facilities. Tulane zooms past those representations, arguing that "Louisiana courts routinely find that marketing brochures and fliers are not contractual promises." *But see Cook v. AAA Worldwide Travel Agency*, 352 So. 2d 243, 245 (La. Ct. App. 1977) (holding travel brochure supported contractual offer), *writ granted sub nom. Cook v. AAA Worldwide Travel Agency, Div. of Am. Auto. Ass'n of La.*, 354 So. 2d 208 (La. 1978), *and rev'd*, 360 So. 2d 839 (La. 1978); *and Philippe v. Lloyd's Aero Boliviano*, 589 So. 2d 536, 544 (La. Ct. App. 1991) (also relying on brochure), *writ denied sub nom. Philippe v. Lloyd's Aero Boliviano Travelworld*, 590 So. 2d 594 (La. 1992). The University relies on a case where the First Circuit Court of Appeal of Louisiana held that a hospice's brochure advertising the company's "vision [ ] to ensure that no one dies alone or in pain" did not constitute a contractual promise guaranteeing that all of its patients would die a pain-free death. *See McGregor v. Hospice Care of La. in Baton Rouge, LLC*, 2008-2029 (La. App. 1 Cir. 3/27/09), 2009 WL 838621, at *8. But the plausibility of a hospice's promise to defeat suffering in death is not akin to the promise of a university to provide in-person instruction, which Tulane had already been doing for the past 170 years. And Louisiana courts routinely look to an institution's "circulars," among other materials, in determining the terms of the educational contract between the institution and students. *Guidry*, 170 So. 3d at 213.

Drawing all reasonable inferences from these factual allegations in the plaintiffs' favor, the Students have plausibly alleged mutual assent between the parties to an implied-in-fact contract for in-person instruction.

Tulane argues that these representations and historic practices do not add up to an implied contract because they are not evidence of an "unequivocal[]" intent to agree. *See Union Tex. Petrol. Corp.*, 503 So. 2d at 165. But we disagree. Louisiana courts interpret performance of implied contracts to "conform to, and be governed by, what is expected of ordinary persons of ordinary prudence." *Frey v. Amoco Prod. Co.*, 603 So. 2d 166, 175 (La. 1992). Here, reasonable jurors could find that Tulane's representations and historic practices, if proven, did represent an unequivocal intent to agree to provide in-person instruction. *See Gociman*, 41 F.4th at 884 (holding plaintiffs in similar COVID-19 refund suit plausibly alleged an implied contract for in-person instruction and on-campus facilities and services based on the university's "catalogs, registration portal, pre-pandemic practice, and different charges for [the] online versus on-campus programs as sources for the contract"); *Shaffer*, 27 F.4th at 760 ("Plaintiffs' factual allegations, combined with the reasonable inferences drawn from them, suffice to support their claims that the Universities promised to provide in-person instruction in exchange for Plaintiffs' tuition payments."); *Ninivaggi*, 555 F. Supp. 3d at 51 ("This history, custom, and course of dealing, along with the school's statements, plausibly created an implied promise of in-person classes.").

The primary difficulty in this case is the absence of express promises to provide the educational services bargained for and agreed to by the parties. Yet, Tulane does not dispute that it agreed to provide instruction. The scope of that *implied* promise to provide instruction—and whether a material term of the parties' agreement was in-person instruction as the Students plausibly allege—is what the parties will appropriately flesh out in discovery.

Tulane also contends that the Students failed to allege that the University "promise[d] to provide in-person education *regardless of the circumstances*."(emphasis added). This allegation is necessary, Tulane argues, because it was effectively impossible for the institution to continue

holding in-person instruction in the second half of the Spring 2020 semester.[7] Whether it was impossible for Tulane to perform its end of the bargain does not go toward the existence of a contract. Instead, it goes toward an impossibility defense to breach and damages. *See Charter Sch. of Pine Grove, Inc. v. St. Helena Par. Sch. Bd.*, 2007-2238 (La. App. 1 Cir. 2/19/09), 9 So. 3d 209, 222; RESTATEMENT (SECOND) OF CONTRACTS § 261 ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."). Tulane has not raised this defense before us on appeal, so we do not reach it.

Finally, Tulane argues that the A&DS forecloses the Students' claims for partial refunds of the pre-paid tuition. We disagree. The A&DS provides:

> **Tuition Remission**- . . . To obtain a remission of tuition, the student must drop the courses online or complete drop/add form(s) with Academic Advising. Tuition will be reduced based on the date of withdrawal. Please consult the Registrar's Academic Calendar for specific dates.

We cannot hold as a matter of law that this language forecloses the Students' claim of entitlement to a partial refund of their pre-paid tuition. As discussed, Tulane has not established in the record that the Students agreed to and signed the A&DS. In addition, the terms of the A&DS only address refunds

---

[7] The Governor's March 22, 2020, Executive Order prohibited gatherings of 10 people or more and required Louisiana residents to stay home except for essential activities (which did not include education). *See* PROCLAMATION NO. 33 JBE 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf?fbclid=IwAR0LfPPYBonoPaJRx_gr3ZKfUR90DqItp_0pZkPUrSg6uKyncuGy8ntm4R8.

that follow from the *Students'* desire to renege on the tuition contract; it does not address refunds that follow from Tulane's failure to perform its end of the tuition contract. Tulane's interpretation of the refund provision is also untenable. Under its reading, the University could cease to provide instruction after the last calendar date of withdrawal and convert its classes to independent study—as it allegedly did for some classes during the second half of Spring 2020—and the Students would be left out to dry. Finally, the University cites no authority for the proposition that a refund policy can be used to excuse non-performance under contract law.

The Students plausibly alleged that Tulane impliedly promised in-person instruction and on-campus facilities and services in exchange for retaining pre-paid tuition and fees money. We reverse the district court's dismissal of the Students' breach-of-contract claim.

## B. UNJUST ENRICHMENT

In the alternative to their breach-of-contract claim, the Students alleged that Tulane's decision to retain the pre-paid tuition and fees money constitutes unjust enrichment. A claim of unjust enrichment under Louisiana law requires: "(1) an enrichment of the defendant; (2) an impoverishment of the plaintiff; (3) a connection between the enrichment and resulting impoverishment; (4) an absence of 'justification' or 'cause' for the enrichment or impoverishment; and (5) no other remedy available at law." *Roe v. Loyola Univ. New Orleans*, No. 07-1828, 2007 WL 4219174, at *2 (E.D. La. Nov. 26, 2007) (citing *Baker v. Maclay Props. Co.,* 648 So. 2d 888, 897 (La. 1995)). The Students contend that they paid tuition and certain fees under an implied-in-fact contract that may not cover the issue in dispute.

The district court dismissed the claim of unjust enrichment based on its finding that the Students did not adequately allege the fourth factor: that Tulane's decision to move classes online was unjust. The district court

erred. The Consolidated Complaint does not take issue with Tulane's transition to online instruction. It takes issue with Tulane's failure to provide a partial refund in exchange for delivering a different product than promised, which the Students do allege was unjust.

Tulane argues that the Students also fail to plausibly allege the other four factors. We disagree. According to the Consolidated Complaint, Tulane retained pre-paid tuition money and failed to hold up its end of the bargain to provide in-person instruction. Thus, the Students plausibly allege that they were impoverished, Tulane was enriched, and that Tulane's enrichment was directly connected to the Students' impoverishment. That satisfies the first three factors.

The Students plausibly allege the fifth factor too because whether they have another remedy at law is not yet clear. "Louisiana law provides that no unjust enrichment claim shall lie when the claim is based on a relationship that is controlled by an enforceable contract." *Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 408 (5th Cir. 2004) (citing *Edwards v. Conforto*, 636 So. 2d 901, 907 (La. 1993), *on reh'g* (May 23, 1994)). The Students bring their unjust enrichment claims as an alternative ground of liability if the district court determines that no viable contract governs Tulane's provision of in-person instruction and on-campus facilities and services. *See* Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."); *id.* 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency."). Because the parties here disagree whether a contract for in-person instruction and on-campus facilities exists, it is not clear "whether another remedy is available" under the law. *Ferrara Fire Apparatus, Inc. v. JLG Indus., Inc.*, 581 F. App'x 440, 443–44 (5th Cir. 2014) (per curiam); *see also Walters v. MedSouth Rec. Mgmt., LLC*, 2010-0352, p. 2 (La 6/4/10); 38 So. 3d

241, 242 (per curiam). Thus, the Students' alternative claim for unjust enrichment may proceed at this early stage.

## C. CONVERSION

The Students alleged that Tulane's retention of pre-paid tuition and fees money constitutes conversion. "Conversion is defined as an act in derogation of the plaintiff's possessory rights or any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently, or for an indefinite time." *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 51 F.3d 553, 557 (5th Cir. 1995).

The district court found that the Students failed to allege that Tulane acted unjustly because the Students did not take issue with Tulane's decision to move classes online. But this was error because the district court misconstrued the Students' claim. The Students challenge Tulane's failure to provide partial refunds, not its decision to transition classes online.

Tulane argues that a conversion claim cannot arise where, as here, the plaintiffs assented to the taking of the property. But under Louisiana law, "[a]lthough a party may have rightfully come into possession of another's goods, the subsequent refusal to surrender the goods to one who is entitled to them may constitute conversion." *Kinchen v. Louie Dabdoub Sell Cars, Inc.*, 05-218 (La. App. 5 Cir. 10/6/05), 912 So. 2d 715, 718, *writ denied*, 2005-2356 (La. 3/17/06), 925 So. 2d 544. And we cannot hold as a matter of law that the Students ratified Tulane's retention of the fees and tuition money by agreeing to the terms and conditions of the A&DS. As noted, genuine disputes of material fact regarding whether the Students saw and agreed to the A&DS preclude reliance on the agreement at this stage.

The Students have plausibly alleged a claim of conversion. We reverse the district court's dismissal of the claim.

No. 21-30681

\*     \*     \*

We REVERSE the order of the district court and REMAND for further proceedings consistent with this opinion.

No. 21-30681

Haynes, *Circuit Judge*, concurring in part, dissenting in part:

The rulings in cases involving other states are interesting but not directly relevant to this case, as we are applying Louisiana law here which has its own parameters. Under Louisiana law, universities such as Tulane are entitled to "great respect" regarding their "academic decisions[.]" *Guidry v. Our Lady of the Lake Nurse Anesthesia Program Through Our Lady of the Lake Coll.*, 170 So. 3d 209, 214 (La. Ct. App. 2015); *see also Miller v. Loyola Univ. of New Orleans*, 829 So. 2d 1057, 1060 (La. Ct. App. 2002) (discussing the "established public policy with both accords educational institutions broad discretion in matters purely academic ... and directs judicial non-interference in the decisions with that discretion." (alteration in original)). While Louisiana law does recognize some causes of action against universities, like breach of contract, these are subject to stringent requirements. *See Guidry*, 170 So. 3d at 214. Causes of action that amount to claims for "educational malpractice" are not permitted. *Miller*, 829 So. 2d at 1061 ("Louisiana law does not recognize a cause of action for educational malpractice under contract or tort law."); *see also Wallace v. S. Univ.*, 301 So. 3d 1162, 1162 (La. 2020) (mem.) (Crichton, J., dissenting from denial of writ application) ("As an initial matter, what plaintiff identifies as 'educational malpractice' is not a valid theory of liability anywhere in Louisiana statutory law or jurisprudence."). As Louisiana law makes clear, "[i]t is not the place of the court system to micro-manage the adequacy of instruction or management at institutions of higher learning, even if it were feasible, which we feel it is not. This is a task best handled by the universities themselves." *Miller*, 829 So. 2d at 1061.

The majority opinion acknowledges these principles of Louisiana law, but it comes to the conclusion that the Students have plausibly alleged claims of breach of contract, unjust enrichment, and conversion against Tulane. I respectfully dissent from the majority opinion as to these conclusions but

No. 21-30681

concur with its ruling on the breach of contract claim regarding the Students's pre-paid, mandatory fees.[1]

## I. Breach of Contract

Turning first to the Students's breach of contract claim, the majority opinion states that "the Students do not challenge the quality of the education received but allege that Tulane undertook a specific, identifiable agreement for the provision of particular services—that is, for the provision of in-person instruction." Majority Op. at 9. The Students, meanwhile, aver that their "paradigmatic contract claim of 'I paid for x and received y' in no way implies that Tulane's online classes were so deficient as to constitute malpractice." However, the Students's complaint indicates otherwise: "Plaintiffs and the members of the Class have paid for tuition for a first-rate education and an on-campus, in-person educational experience[], . . . . Instead, students like Plaintiffs were provided a *materially deficient and insufficient alternative*, which constitutes a breach of the contracts entered into by Plaintiffs with the University." Elsewhere, the Students contend that "[t]he online learning options being offered to Defendant's students *pale in comparison* to the on-campus, in-person educational experience Plaintiffs and class members contracted with Defendant to provide," and discuss "Defendant's practice of failing to provide reimbursements for tuition and Mandatory Fees despite *the diminished value of the education* and other experiences that it provided[.]"

---

[1] Because I concur with the majority opinion's determination that "[t]he Students plausibly allege that when Tulane charged a fee for services, it promised to provide them[,]" Majority Op. at 17, I do not address this facet of the Students's breach of contract claim in detail. As a result, I fail to see any basis for unjust enrichment and conversion in this context, so I respectfully dissent to those conclusions.

These statements are not isolated aberrations within the Students's complaint. At other points in the complaint, the Students assert that "Defendant's online course policy and deeply discounted online course tuition reflects the *inability of online classes* to replicate the full academic opportunities and experiences of in-person instruction." They argue that "[t]he online formats being used by Defendant do not require memorization or the development of strong study skills . . . . Further, the ability to receive a Pass-Fail grade . . . provides educational leniency that the students would not otherwise have with the in-person letter grading education." Finally, the Students state that they "seek damages relating to Defendant's *passing off* an online, 'virtual' college experience as similar in kind to full immersion in the academic life of a college campus."

Unlike the majority opinion, I read these statements for what they plainly are: challenges to the quality of education that the Students received from Tulane. By contending that the education they received "pale[s] in comparison" to the education they purportedly bargained for, the Students invite this court to qualitatively assess the differences between an in-person and remote education, in the context of a worldwide pandemic, and decide that the Students experienced a "diminished value of the[ir] education" sufficient to justify "reimbursements for tuition." The "essence" of the Students's challenges to Tulane's provision of remote education is thus educational malpractice, a cause of action not recognized by Louisiana law. *Mills v. Tarver*, 340 So. 3d 959, 971 (La. Ct. App. 2021) (looking at the "essence [of] the plaintiffs' claims" to determine that they "are academic disputes[]"); *see also Miller*, 829 So. 2d at 1061 ("It is not the place of the court system to micro-manage the *adequacy of instruction or management* at institutions of higher learning . . . . This is a task best handled by the universities themselves." (emphasis added)).

No. 21-30681

This deficiency alone should doom the Students's breach of contract claim on this matter (and result in affirmance), but a second, related defect also proves fatal if anything remains: the Students failed to plead that Tulane acted in an arbitrary and capricious manner. The majority opinion recognizes that, "when challenging 'the substance of genuinely academic decisions,' plaintiffs must additionally show that the 'institution exercise[d] its discretion in an arbitrary or irrational fashion.'" Majority Op. at 9 (quoting *Guidry*, 170 So. 3d at 214–15). However, the majority opinion subsequently reasons that "[d]eciding whether Tulane breached its agreement to provide in-person instruction and on-campus access to facilities in exchange for pre-paid tuition and fees does not implicate educational questions best left to professional academic judgment." Majority Op. at 10. As I discuss above, the Students's breach of contract claim cannot be divorced from the true nature of their complaint. Challenges to the educational merits of Tulane's shift to remote coursework are inherent to the Students's breach of contract claim, and they cannot be separated from the Students's arguments with respect to tuition. Consequently, we should apply the arbitrary and capricious standard to the Students's breach of contract claim.

Under Louisiana law, "[n]otwithstanding the strong public policy of judicial restraint in disputes involving academic standards, the decisions of educators are not completely immune from judicial scrutiny, and courts will intervene if an institution exercises its discretion in an arbitrary or irrational fashion." *Guidry*, 170 So. 3d at 215; *see also Mills*, 340 So. 3d at 972 ("A contract between a private institution and a student confers duties upon both parties, which cannot be arbitrarily disregarded and may be judicially enforced." (quoting *Guidry*, 170 So. 3d at 213–14)). Other courts have applied this standard in the context of "disciplinary decisions" by private universities. *Ahlum v. Adm'rs of Tulane Educ. Fund*, 617 So. 2d 96, 99 (La. Ct. App. 1993) ("The disciplinary decisions of a private school may be

30

reviewed for arbitrary and capricious action."). Moreover, the Louisiana Supreme Court, while assessing breach of contract claims by a teacher against a university, stated that "[t]he determination made by the defendant . . . does not appear to have been an arbitrary and capricious act," before holding that it was unacceptable for the court to "substitut[e] [its] judgment for that of the members of the board of directors of Loyola University who undoubtedly acted in the utmost good faith and whose prerogative it was to make the determination under the provisions of the contracts." *Kalshoven v. Loyola Univ.*, 85 So. 2d 34, 36 (La. 1956).

This case law weighs in favor of applying the heightened arbitrary and capricious standard to the Students's breach of contract claim. As the court in *Guidry* noted, "*even if course descriptions contain an identifiable contractual promise*, given the judicial deference afforded to educational institutions to manage their curricula, such a promise will *not be enforced absent a showing that the academic institution's determination was arbitrary or capricious*." *Guidry*, 170 So. 3d at 213 n.4 (emphasis added). While the majority opinion reasons that "the Students do not need to allege that Tulane acted arbitrarily or capriciously because they do not challenge a genuinely academic decision[,]" Majority Op. at 10–11, the *Guidry* court's discussion of the application of the arbitrary and capricious standard in the context of students relying on course descriptions for implied educational contracts clearly indicates that we should apply the heightened standard to the Students's breach of contract claim.

Applying the arbitrary and capricious standard here, the Students's claim fails. As Tulane correctly notes, the Students do not argue that Tulane's decision to suspend in-person classes and institute remote education was arbitrary or capricious. The Students aver that "they claimed Tulane is contractually liable for refusing to issue partial refunds though it was unable to provide the promised services." However, the "essence" of

their breach of contract claim is predicated on allegations of educational malpractice that are inextricably bound up with Tulane's provision of remote education. *See Mills*, 340 So. 3d at 971. Because the Students's arguments as to reimbursement cannot be separated from their contentions regarding Tulane's "materially deficient and insufficient" remote education, I would apply the heightened standard to the Students's breach of contract claim and conclude that, under this standard, the claim should be dismissed.

Finally, I remain unconvinced that the Students satisfied the requirement under Louisiana law that students suing universities be able to point to a "specific, identifiable agreement for the provision of particular services[]" as a basis for their breach of contract claims. *Miller*, 829 So. 2d at 1060.

The majority opinion acknowledges that under Louisiana law, "[w]here a student can establish 'a specific, identifiable agreement for the provision of particular services,' the university remains liable." Majority Op. at 9 (quoting *Miller*, 829 So. 2d at 1060). However, in this case there is no "specific, identifiable agreement" to which the Students can point that guarantees in-person education as a "particular service[]" for students. *Miller*, 829 So. 2d at 1060; *see also Guidry*, 170 So. 3d at 214 ("[I]n order to state a claim for breach of contract, the plaintiff must do more than merely allege that a promise was inadequately performed; a plaintiff must point to an *identifiable contractual promise* that the defendant failed to honor."). As the majority opinion concedes, the Students do not allege the existence of any express contract. *See* Majority Op. at 22 ("The primary difficulty in this case is the absence of express promises to provide the educational services bargained for and agreed to by the parties."). Instead, the majority opinion's determination regarding the Students's tuition-related contract claim is based on "an *implied-in-fact* contract with Tulane for in-person instruction and on-campus facilities." Majority Op. at 15.

No. 21-30681

I disagree with the notion that "a specific, identifiable agreement for the provision of particular services,"—in this instance in-person education—can be read into an implied contract derived from various materials that never specifically guarantee in-person education. *Miller*, 829 So. 2d at 1060; *see generally Implied*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. Not directly or clearly expressed; communicated only vaguely or indirectly . . . 2. Recognized by law as existing inferentially"). Therefore, I disagree with the majority opinion's conclusion "that the Students have plausibly alleged implied-in-fact promises for in-person instruction and on-campus facilities." Majority Op. at 8.

## II. Unjust Enrichment

Neither the Students nor the majority opinion dedicate much time to the Students's unjust enrichment and conversion claims, so I will also be brief in noting my dissent to the majority opinion's approach to these claims.

Regarding the Students's unjust enrichment claim, the majority opinion states that, "[a]ccording to the Consolidated Complaint, Tulane retained pre-paid tuition money and failed to hold up its end of the bargain to provide in-person instruction. Thus, the Students plausibly allege that they were impoverished." Majority Op. at 25. I see it differently: "In return for [their] tuition payment[s] [the Students] received instruction and credit for attending the[ir] course[s][.]" *Miller*, 829 So. 2d at 1061–62. These courses may have been remotely administered, but Tulane courses they remained, and the Students were able to receive this continued education solely because the university was willing to persevere in teaching its students through a pandemic. While the majority opinion determines that "[t]he Consolidated Complaint . . . takes issue with Tulane's failure to provide a partial refund in exchange for delivering a different product than promised, which the Students do allege was unjust[,]" Majority Op. at 25, the Students's

No. 21-30681

complaint is replete with arguments indicating their dissatisfaction with remote education. "Despite [their] claims that the course instruction was unsatisfactory, [the Students] got the value from the course that was guaranteed by [their] tuition payment[s]." *Miller*, 829 So. 2d at 1062. Therefore, I conclude that the district court correctly dismissed the Students's unjust enrichment claim.

### III. Conversion

Finally, as to the Students's conversion claim, I find persuasive Tulane's argument that the Students assented to the taking and retention of their tuition in exchange for the education that Tulane provided. Even assuming arguendo that there are "genuine disputes of material fact regarding whether the Students saw and agreed to the A&DS," it remains true that the Students decided to continue studying at Tulane following the university's announcement that it would shift to remote coursework. Majority Op. at 27. "[O]ne who might otherwise be entitled to maintain an action for the conversion of his goods may afford the alleged wrongdoer a complete defense to the action by waiving the right to treat the act as wrongful, or by ratification thereof." *Aymond v. State, Dep't of Revenue & Tax'n*, 672 So. 2d 273, 276 (La. Ct. App. 1996). That is, "[i]f [an] owner expressly *or impliedly* assents to or ratifies the taking, use, or disposition of his property, he *cannot* recover for conversion of the property." *Id.* (emphasis added).

Tulane announced its plan to institute remote education on March 11, 2020. The first Student to file suit against Tulane did so on September 14, 2020. There is no indication in the complaint that the Students objected to or questioned Tulane's decision to retain the Students's tuition on or near March 11, 2020, or at any point prior to September 14, 2020. Therefore, I conclude that the Students implicitly assented to the retention of their

tuition, and that the district court properly granted Tulane's motion to dismiss with respect to the Students's conversion claim. *See id.* ("[T]he right to sue in conversion may be defeated by *any act or conduct* which amounts to an estoppel." (emphasis added)).

In sum, "[e]ducation must be flexible to accommodate changing circumstances," *Miller*, 829 So. 2d at 1062, and Tulane appropriately accommodated changing circumstances posed by the COVID-19 pandemic when it temporarily shifted from in-person to remote education. While the Students may not have expected to take their courses remotely, they continued to "receive[] instruction and credit for attending the[ir] course[s]" throughout the pandemic "[i]n return for [their] tuition payment[s][.]" *Id.* at 1061–62. Holding that the Students plausibly alleged claims of breach of contract, unjust enrichment, and conversion in this context could "present[] . . . a flood of litigation against schools" based upon measures taken during the COVID-19 pandemic. *Id.* at 1060 (quoting *Ross v. Creighton University*, 957 F.2d 410, 414 (7th Cir. 1992)). Such a flood could swell in the future as universities deal with other pandemics and external events that disrupt the provision of in-person education. *See id.* ("The sheer number of claims that could arise if this cause of action were allowed might overburden schools." (quoting *Ross*, 957 F.2d at 414)).

Accordingly, I conclude that the district court correctly granted Tulane's motion to dismiss, except with respect to the portions of the Students's breach of contract claim related to mandatory fees. Therefore, I would reverse and remand only that claim as it relates to such fees.[2]

---

[2] While I think my analysis is correct, given the disagreement with my esteemed colleagues, there is a good argument to certify these issues to the Louisiana Supreme Court.

---

This case invokes important questions that remain unanswered under Louisiana law. Given the different ruling between my colleagues and me, one can argue that the Louisiana precedent is unclear with respect to the nature and scope of educational malpractice claims, including how such claims may play out in the context of implied educational contracts. To wit, the Louisiana Supreme Court appears to have only discussed educational malpractice once, when Justice Crichton briefly noted that "what plaintiff identifies as 'educational malpractice' is not a valid theory of liability anywhere in Louisiana statutory law or jurisprudence." *Wallace*, 301 So. 3d at 1162 (Crichton, J., dissenting from denial of writ application).

Accordingly, I would certify the following issues to the Louisiana Supreme Court: (1) what is the scope of educational malpractice, and (2) how may the educational malpractice bar arise in the context of breach of contract claims against universities by students who rely on implied contracts for the provision of in-person education. *See In re Katrina Canal Breaches Litig.*, 613 F.3d 504, 509 (5th Cir. 2010) ("[C]ertification may be advisable where important state interests are at stake and the state courts have not provided clear guidance on how to proceed." (quotation omitted)); *see also Jesco Const. Corp. v. NationsBank Corp.*, 278 F.3d 444, 448 (5th Cir. 2001) (same). If we did so, we could ask about the other two causes of action as well.